# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>Facebook ID #100012688907190; Facebook ID<br>#1078573387; and Facebook ID #100020192326746<br>that is within the possession, custody, or control of<br>Facebook, Inc. | Case No. 2:19-MJ-02500 |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

- ☑ Evidence of a crime;
- ☑ Contraband, fruits of crime, or other items illegally possessed;
- ☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

*Code section(s)*                    *Offense Description*

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Albert J. Smith, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*

Frederick F. Mumm, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lindsay M. Bailey (x6875)

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following accounts (collectively referred to as the "SUBJECT ACCOUNTS"):

      a.   Facebook account screen name "Juan Gurrola" Facebook ID: #100012688907190 ("SUBJECT ACCOUNT #1"); used by Juan Gurrola-Rojas;

      b.   Facebook account screen name "Alejandro Figueroa Torres" Facebook ID: #1078573387 ("SUBJECT ACCOUNT #2"); used by Alejandro Figueroa Torres; and

      c.   Facebook account screen name "Rodrigo Buciaga" Facebook ID: #100020192326746 ("SUBJECT ACCOUNT #3"); used by Rodrigo Burciaga.

The SUBJECT ACCOUNTS are stored at premises within the possession, custody or control of Facebook, a provider of electronic communications services and remote computing services, headquartered and accepts service of legal process at 1601 Willow Road, Menlo Park, California 94025, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.    **SEARCH PROCEDURE**

1.     The warrant will be presented to personnel of Facebook
Inc. (the "PROVIDER"), who will be directed to isolate the
information described in Section II below.

2.     To minimize any disruption of service to third
parties, the PROVIDER's employees and/or law enforcement
personnel trained in the operation of computers will create an
exact duplicate of the information described in Section II
below.

3.     The PROVIDER's employees will provide in electronic
form the exact duplicate of the information described in Section
II below to the law enforcement personnel specified below in
Section IV.

4.     With respect to contents of wire and electronic
communications produced by the PROVIDER (hereafter, "content
records," see Section II.10.a. below), law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction (the "search team") will examine such content records
pursuant to search procedures specifically designed to identify
items to be seized under this warrant.  The search shall extract
and seize only the specific items to be seized under this
warrant (see Section III below).  The search team may use
forensic examination and searching tools, such as "EnCase" and
"FTK" (Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques.

5.   If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

**II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with SUBJECT ACCOUNT, limited to that which occurred on or after January 8, 2019;

b.   For each of the above-described SUBJECT ACCOUNTS, the PROVIDER is required to disclose the following information including:

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures or photos,

videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All stored electronic communications and other files reflecting communications, including all available backups and content, to or from the Facebook accounts associated with the SUBJECT ACCOUNTS.

iv. All records pertaining to communications between Facebook and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

v. All photos and videos uploaded by that user ID, all photos and videos uploaded by any user that have that user tagged in them, and all photos and videos "liked" or commented on by the user, as well as any metadata associated therewith, including, specifically, EXIF data;

vi. All profile information, "About Me" information, and Neoprint information, including the user's website; News Feed information, including any information hidden from News Feed; status updates and "recent activities"; links to videos, photographs, articles, and other items; Notes; Wall postings ("Posts by You," "Posts by Others," and "Posts to Others"); friend lists, including persons identified as "family," and including the friends' Facebook user identification numbers and any deleted or removed friends; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; lists of "followers" and "following" accounts; future and past event postings, invitations, and

events sent to or joined by the user; "stories" by, tagged, or commented on by the user; places "liked" or visited by the user; "Friend" requests, including Friend requests sent to or from the SUBJECT ACCOUNTS, and including Friend requests accepted or rejected; comments; gifts; pokes; tags, including both who has been tagged on the SUBJECT ACCOUNTS' profiles and when the user of the SUBJECT ACCOUNTS has been tagged in other users' profiles; notifications and notification settings of any kind; information about the user's access and use of Facebook or third-party applications or "apps"; and any "shares" – i.e. content shared with other Facebook users;

vii. All other records of communications and messages of any kind made or received by the user, including all private or instant messages or "chats," and specifically including all attachments to any messages in their native formats (for example, if a .zip file was sent to another user, the .zip file shall be provided), history of communications of any kind, video calling history, and pending "Friend" requests;

viii.   All "Active Sessions" information and activity logs for the account and all other documents showing the user's posts and other Facebook activities;

ix.  All search history and web history for the user of the SUBJECT ACCOUNTS, including records of Facebook searches and internet/web searches, and including web browsing that might occur outside of Facebook, but that Facebook is able to connect to the SUBJECT ACCOUNTS when the SUBJECT ACCOUNTS visits websites that are using Facebook's webpage "like" functionality;

x.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked" ("Likes on Others' Posts," "Likes on Your Posts from Others," and "Likes on Other Sites"), as well as all information about the Facebook pages of which the account is or was a "fan" and any information in the account's connections;

xi.  All records of Facebook Notes or use of Facebook's web logging or "blogging" features, including importing of blogs from other services;

xii. All "Ads Clicked" information;

xiii.           All "Ad Topics" information;

xiv. Any credit card numbers provided by the user for purchases on Facebook.

c.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes**

**made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNTS.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

iii. Any information showing the location of the users of the SUBJECT ACCOUNTS, including while sending or receiving a message using the SUBJECT ACCOUNTS or accessing or logged into the SUBJECT ACCOUNTS.

iv.  All "check ins," "last location," and other location information;

v.   All past and present lists of friends created or accepted by the account;

vi.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, privacy settings that apply to certain lists of Facebook friends and the accompanying lists, and all records showing which Facebook users have been blocked by the account;

vii. All information about the user's access and use of Facebook Marketplace;

viii.    All information about connections between the account and third-party websites and applications;

ix.   All information related to the SUBJECT ACCOUNTS' membership in any groups, including the identity of other accounts in the same group, and information identifying any groups or organizational pages or accounts for which the SUBJECT ACCOUNTS is/are an administrator;

x.    All push token or device token identifiers;

xi.   Facial recognition data.

xii.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

xiii.    Any information identifying the device or devices used to access the SUBJECT ACCOUNTS, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information

regarding the types of devices used to access the SUBJECT
ACCOUNTS or other device-specific information, including the
device type, brand name, device mode or operating system, and
first and last times that a device were observed;

(I)  Any other account accessed by a device with an
identifier responsive to the device identifiers called for in
paragraph 10.b.iv.

### III.  <u>INFORMATION TO BE SEIZED BY THE GOVERNMENT</u>

11.  For each SUBJECT ACCOUNT listed in Attachment A, the
search team may seize:

a.  All information described above in Section II.10.a.
that constitutes evidence, contraband, fruits, or
instrumentalities of violations of Title 21, United States Code
Sections 841, 843(b), 846, 952, 963, and violations of Title 18,
United States Code, Sections 1956, and 1957, namely:

i.  Information relating to who created, accessed, or used
the SUBJECT ACCOUNT, including records about their identities
and whereabouts.

ii.  The purchase and distribution of illegal drugs or
other contraband; and the transfer of any monetary funds or
financial instruments.

iii. The identity of the person(s) who communicated with
the SUBJECT ACCOUNTS about matters relating to the purchase and
distribution of illegal drugs or other contraband; and the
transfer of any monetary funds or financial instruments,
including records that help reveal their whereabouts.

b.   All records and information described above in Section II.10.b.

**IV.   PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

> **Special Agent Albert Smith**
> **SWB-4**
> **255 E. Temple Street, 17th Floor**
> **Los Angeles, CA 90012**
> **Phone: 213-621-6761**
> **E-Mail: albert.smith2@usdoj.gov**

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

## AFFIDAVIT

I, Albert Smith, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a search warrant for information associated with the following accounts (collectively, the "SUBJECT ACCOUNTS"):

a.    Facebook account screen name "Juan Gurrola" Facebook ID: #100012688907190 ("SUBJECT ACCOUNT #1"); used by Juan Gurrola-Rojas ("GURROLA");

b.    Facebook account screen name ""Alejandro Figueroa Torres" Facebook ID: #1078573387 ("SUBJECT ACCOUNT #2"); used by Alejandro Figueroa Torres ("FIGUEROA TORRES");

c.    Facebook account screen name "Rodrigo Burciaga" Facebook ID: #100020192326746 ("SUBJECT ACCOUNT #3"); used by Rodrigo Burciaga ("BURCIAGA").

2.    The SUBJECT ACCOUNTS are stored at premises controlled by Facebook Inc., a provider of electronic communications services and remote computing services, headquartered at 1601 Willow Road, Menlo Park, California 94025 ("Provider" or "Facebook").[1]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate

3.    The SUBJECT ACCOUNTS are described in the following paragraphs and in Attachment A to the search warrant application.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require Facebook to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

---

judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

4.    As described more fully below, I respectfully submit that there is probable cause to believe that the information associated with SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations, specifically, distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so, in violation of 21 U.S.C. §§ 846, 841(a)(1); importation of controlled substances, and attempt and conspiracy to do so, in violation of 21 U.S.C. §§ 963, 952; unlawful use of a communications facility to facilitate the above-listed narcotics offenses, in violation of 21 U.S.C. § 843(b); and laundering of monetary instruments, and conspiracy to do so, in violation of 18 U.S.C. §§ 1956 and 1957 ("Target Offenses").

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses, and my own participation in this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are relayed in substance and in part only.

## II.  BACKGROUND FOR SPECIAL AGENT ALBERT SMITH

6.    I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct

investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

7.    I have been employed as a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") since January 2016. I am currently assigned to the DEA Los Angeles Field Division ("LAFD") Southwest Border Group 4 ("SWB4"). Prior to attaining sworn status as a SA, I was employed by DEA and received approximately 20 weeks of training in narcotics trafficking investigations and related legal matters at the DEA Training Academy in Quantico, Virginia. Prior to being employed by the DEA, I was employed as a Customs and Border Protection Officer with Customs and Border Protection, Department of Homeland Security in Hidalgo, Texas from November 2013 through August 2015.

8.    During the course of my employment with DEA, I have received several hundred hours of comprehensive, formalized instruction to include such topics as drug identification; money laundering techniques; patterns of drug trafficking; complex conspiracies; the exploitation of narcotics traffickers' telecommunications devices; criminal law; surveillance; and other investigative techniques. I have assisted in numerous investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not

limited to such techniques as surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis in other Title III and California State wiretap investigations.

9.    Through these investigations, my training and experience, and my conversations with more senior federal and state law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics.  I am particularly familiar with methods employed by large-scale drug trafficking organizations, and the sophisticated tactics that they routinely use in attempts to thwart the investigation of their narcotics organizations, including the utilization of cellular telephone technology, counter surveillance techniques, debit calling cards, public telephones, hidden vehicle compartments, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.    On December 20, 2019, United States Magistrate Judge Maria A. Audero of the Central District of California signed a search warrant authorizing the disclosure of the content of SUBJECT ACCOUNT #1 to the DEA.  On March 28, 2019, I reviewed the translated content of SUBJECT ACCOUNT #1 for the time period of November 1, 2018, through January 9, 2019, and discovered conversations regarding illegal activity between GURROLA, using

SUBJECT ACCOUNT #1, and FIGUEROA TORRES, using SUBJECT ACCOUNT #2, as well as between GURROLA, using SUBJECT ACCOUNT #1, and BURCIAGA, using SUBJECT ACCOUNT #3.  For example, on December 8, 2019, GURROLA and FIGUEROA TORRES discussed transporting one-and-one-half units of narcotics to Las Vegas, Nevada, using a courier.  Additionally, on November 7, 2018, GURROLA told BURCIAGA that he would transfer approximately $20,000 Mexican pesos to BURCIAGA to pay for an outstanding narcotics debt.

11.  GURROLA additionally uses SUBJECT ACCOUNT #1 to make arrangements with couriers to smuggle narcotics from Tijuana, Mexico, into various locations within the United States.  For example, he has previously used SUBJECT ACCOUNT #1 to request that a confidential informant transport narcotics to San Fernando, California, and to ask the confidential informant to find another courier who would be willing to smuggle narcotics across the Mexico-United States border.  Subsequently, DEA Agents in Colorado seized cocaine from a courier who claimed that she was transporting narcotics on behalf of "Gallo," a common alias used by GURROLA.

## IV.  STATEMENT OF PROBABLE CAUSE

12.  Based on my training and experience, my review of investigative reports, my conversations with fellow law enforcement officers and witnesses, and my own participation in this investigation, I know the following:

      1.   Identification of GURROLA as a Narcotics
Trafficker

13.  On November 1, 2018,[3] Federal Bureau of Investigations
("FBI") SA Garth Badgley informed me that a drug trafficker
based in Tijuana, Mexico was utilizing Facebook Messenger to
coordinate the shipments of multi-pound quantities of
methamphetamine and multi-kilogram quantities of cocaine and
heroin into the United States.  Through a Confidential Source
("CS-1"),[4] SA Badgley learned that GURROLA (also referred to as
"Gallo"), had asked CS-1 on approximately seven occasions to
smuggle narcotics across the United States-Mexico border to
various locations within the United States, including San
Fernando, California.  Moreover, on at least one prior occasion,
CS-1 actually smuggled narcotics across the border at the
direction of GURROLA, at which time GURROLA wrapped the
narcotics in vacuum-sealed/plastic wrapped bricks and hid them
in a false compartment inside of a spare tire.

      2.   Narcotics Related Conversations on the SUBJECT
ACCOUNTS

14.  On December 6, 2018, the Honorable United States
Magistrate Judge Charles F. Eick in the Central District of

---

[3] All dates in this affidavit are on or about and all times
are approximate, and unless otherwise specified, Pacific
Daylight Time.

[4] CS-1 has provided information to the FBI since June of
2018 and to the DEA since November of 2018.  CS-1's reporting
has historically proven to be reliable and accurate.  To my
knowledge, CS-1 has not made false statements to me or any other
government agent.  CS-1 does not have any prior arrests. As of
December 3, 2018, CS-1 has been paid approximately $4,033 by the
FBI for work done on behalf of the FBI, and has not been paid by
the DEA.

California, authorized the installation and use of a trap and trace device for SUBJECT ACCOUNT #1. The Pen Register was installed on December 7, 2018 and activated on the same day. On December 20, 2018, United States Magistrate Judge Maria A. Audero of the Central District of California signed a search warrant authorizing the disclosure of the content of SUBJECT ACCOUNT #1 to the DEA. I served the search warrant on Facebook that same day, and they provided a response on January 8, 2019, which included content from November 1, 2018, through January 9, 2019.

15. In reviewing the contents of SUBJECT ACCOUNT #1, I learned that GURROLA had frequent contact with FIGUEROA TORRES and BURCIAGA on SUBJECT ACCOUNTS #2 and #3, respectively, as well as conversations with others in which they discussed drug trafficking and money laundering. The conversations included, but are not limited to, the following:

   a.   *Communications between GURROLA, CS-1, and FIGUEROA TORRES*

16. From December 8 through December 11, 2018, GURROLA, using SUBJECT ACCOUNT #1, asked CS-1 to move approximately one-and-one-half units of an unknown type of narcotics to Oregon.

   a.   Specifically, on December 8, 2019, beginning at approximately 9:18 a.m., GURROLA sent CS-1 a message over Facebook Messenger stating "there is an exit to Las Vegas today" for "1500," later asking her to "Tell me if you want it." Based on my training and experience, and CS-1's representations that she has only ever transported narcotics for GURROLA, I believe

that GURROLA was asking CS-1 if she would deliver narcotics to Las Vegas for a courier's fee of $1,500.  CS-1 responded that CS-1 was "interested" but stated "I don't want it to be fully loaded for just $1,500, you understand me?"  Based on my training and experience, as well as my knowledge of the investigation, I know that CS-1 was telling GURROLA that CS-1 did not want to transport a car full of narcotics for $1,500 due to the high risk involved.

b.   Similarly, on December 11, 2018, beginning at approximately 9:40 a.m., GURROLA contacted CS-1 via Facebook messenger, stating "This one exit to San Fernando gives $700." Based on my training and experience and my knowledge of this investigation, I believe GURROLA was asking CS-1 to transport narcotics to San Fernando, California, for a courier's fee of $700.  On December 16, 2018, beginning at approximately 8:01 a.m., GURROLA asked CS-1 "Have you not found anyone who wants to work from here?" to which CS-1 responded "Well that girl, but like the other time let you down."  GURROLA responded "You can tell her there is work from here to the inside."  Based on my training and experience and my knowledge of this investigation, I believe that GURROLA was asking CS-1 if CS-1 could locate and identify another courier who could work from him.  Additionally, when GURROLA stated "from here to the inside," he was referring to his location in Tijuana, Mexico and the United States.

c.   While GURROLA was having the above conversations with CS-1, he was also in contact with SUBJECT ACCOUNT #2, believed to be used by FIGUEROA TORRES.  For example, on

9

December 8, 2018, at approximately 5:29 pm, GURROLA messaged
FIGUEROA TORRES "There's a trip to Las Vegas, buddy," followed
by messages "1500" and "its 1 1/2".  Accordingly, I believe that
GURROLA, using SUBJECT ACCOUNT #1, told FIGUEROA TORRES, using
SUBJECT ACCOUNT #2, to arrange for narcotic shipments both into
and throughout the United States.

> b.   *Communications between GURROLA and FIGUEROA*
>      *TORRES*

17.   GURROLA also had conversations directly with FIGUEROA
TORRES regarding drug trafficking.  For example, beginning on
November 29, 2018, GURROLA, using SUBJECT ACCOUNT #1
communicated with FIGUEROA TORRES, using SUBJECT ACCOUNT #2.

a.   On November 30, 2018, at approximately 6:06 p.m.,
GURROLA messaged FIGUEROA TORRES "Have they mentioned anything
to you about the horses?" to which FIGUEROA TORRES responded
"Nothing yet."  FIGUEROA TORRES then asked "Does 4 or 5 fit in
the bag?" to which GURROLA responded "that's right buddy."
GURROLA then stated "600 in Los ▆ (Angeles)[5]" and FIGUEROA
TORRES responded "For each one or for the 30, buddy?"  GURROLA
later responded "Did you ask me for 🐕" to which FIGUEROA TORRES
responded "Correct. The chivos."  Based on my training,
experience, and knowledge of the investigation, I now that the
term "chivos," which translates literally from Spanish to
"goats," is a common code word for marijuana.  Accordingly, I
believe that during this conversation, GURROLA was asking about
the status of a marijuana shipment, and FIGUEROA TORRES was

---

[5]All statements in parenthesis are my interpretations of the
icons used in text conversations.

trying to determine how many packages of marijuana would fit in a bag or other concealment method.  GURROLA then stated that it would be $600 to transport the marijuana to Los Angeles, and FIGUEROA TORRES asked if it would be $600 for each of the 30 individual units, or if the $600 was for the entire transport.

        c.   *Communications between GURROLA and BURCIAGA*

    18.  Finally, GURROLA had conversations with BURCIAGA regarding drug trafficking and money laundering.  For example, beginning on November 7, 2018, GURROLA, using SUBJECT ACCOUNT #1, communicated with BURCIAGA, using SUBJECT ACCOUNT #2.

    a.  On November 7, 2018, at 5:54 p.m., GURROLA sent BURCIAGA the following photograph via Facebook Messenger:



b.    Based on my training and experience, I recognize this photograph to be of a receipt for a wire transfer of $20,000 Mexican pesos to BURCIAGA.  GURROLA then stated "That's already in the account, buddy.  I'm waiting for a buddy to give me the other ones, so I can make the deposits."  Based on my training, experience, and knowledge of the investigation, I believe GURROLA was telling BURCIAGA that he had already wired him $20,000 in narcotics proceeds, but was waiting to get the rest of the money GURROLA owed BURCIAGA.  On November 16, 2018, at approximately 8:13 a.m., BURCIAGA asked GURROLA "How is it going, man?" later stating "I'm still waiting."  In response, GURROLA stated "I already have it, honestly.  It's just that I have a problem," later stating "I'll collect the rest and I'll send it to you on Sunday, at the latest."  Accordingly, I believe that GURROLA was explaining to BURCIAGA that he would pay BURCIAGA the outstanding debt no later than that Sunday, November 18, 2018.

c.    On November 27, 2018, BURCIAGA messaged GURROLA "What's going on, man?" and "Waiting for an answer, dude." Based on my training, experience, and knowledge of this investigation, I believe that BURCIAGA was again asking GURROLA for the remainder of GURROLA's narcotics debt.  In response, GURROLA stated "A job was done today, buddy.  I'll see if I can deposit the rest" to which BURCIAGA responded with a thumbs up image.  Accordingly, I believe that GURROLA stated that he had completed another narcotics transaction earlier that day and

would send the proceeds to BURCIAGA to pay for his outstanding debt.

      d.   On December 1, 2018, BURCIAGA again inquired about the debt, stating "I'm going to give you until Monday, man. Not another day. I'm the one getting screwed over. With the interests."  GURROLA responded "You'll get it as soon as I get it, as I told you" to which BURCIAGA responded "You have until Monday, man. Sorry. I've been way too nice. Or maybe an idiot, man. And you fail to see that."  GURROLA then stated "Don't think I'm just here doing nothing."  Accordingly, I again believe that BURCIAGA and GURROLA were discussing the outstanding debt, with BURCIAGA demanding that it be paid by that Monday, December 3, 2018.

      e.   On December 6, 2018, at approximately 10:25 p.m., GURROLA sent BURCIAGA the following photograph:



f.    Based on my training, experience, and knowledge of the investigation, I recognize this to be a photographs of a receipt for a wire transfer of $12,000 to "Josuhe Emmanuel Burciaga Medrano."  GURROLA then messaged "There it is.  I'll deposit the other four tomorrow."  Accordingly, I believe GURROLA owed BURCIAGA an additional $4,000 and agreed to pay BURCIAGA by December 7, 2018.  The following day, BURCIAGA wrote "The guy is already in Capo. So you can go ahead and deposit that for him."  GURROLA responded with a voice message[6] and the following photograph:



---

[6] Facebook, Inc. does not provide the content of voice messages in response to a search warrant.  I therefore do not know the content of this voice message.

g.    GURROLA also sent the message "Done, buddy." Based on my training and experience, I recognize this as a receipt for a wire transfer of $4,000.   I therefore believe that GURROLA was showing BURCIAGA that he had made the final payment and no longer owed a debt.

3.    <u>Arrest of Valeria Victoria PEREZ and seizure of approximately 3.24 kilograms of cocaine on January 7, 2019</u>

19.   Based on my conversations with DEA Denver, Colorado ("DEA Denver") SA Drew Hatch and other law enforcement officers, as well as my review of the relevant reports to this incident, I know the following:

a.    Beginning in November of 2018, DEA Denver initiated a State of Colorado Title III wiretap investigation into the Drug Trafficking activities of Jorge MEJIA and Bernardo CAMACHO.  On January 6, 2019, SA Hatch received information pursuant to the court-authorized interceptions of MEJIA that Valeria Victoria PEREZ, acting on behalf of GURROLA, would be travelling to the Colorado area with an unknown amount of narcotics.

b.    Specifically, on January 6, 2019 at approximately 2:46 pm, MEJIA received a telephone call from PEREZ in which PEREZ stated that she was calling on behalf of "Gallo," which is a common alias used by GURROLA.   PEREZ told MEJIA that her car was overheating and that she likely would not make it to Denver, Colorado, where MEJIA was located, but that she would try.

c.    At approximately 7:06 pm, MEJIA received another telephone call from PEREZ asking if MEJIA could "go down."

15

MEJIA then asked where PEREZ was, and PEREZ responded that she was on I-70.  MEJIA told her to go to "I-25" and get off at "84th."  PEREZ confirmed and MEJIA told her to call when she arrived.  At approximately 7:41 p.m., PEREZ again called MEJIA and said that she didn't think she would make it.  MEJIA acknowledged and told PEREZ to call him in the morning.  PEREZ then asked if "it" would happen in the afternoon, later saying that she would try to make it all the way there.  MEJIA acknowledged and again told PEREZ to call him.

        d.   On January 7, 2019 at approximately 8:48 am, MEJIA called PEREZ, at which time PEREZ asked what time they were going to meet up.  MEJIA responded that it would be at the same place he had previously told her, later telling her to take I-25 and get off at 84th.  MEJIA then asked how long it would take her to get there, and PEREZ responded that it would be a couple of hours.  At approximately 11:50 am, MEJIA sent a text message to PEREZ asking "where are you?" to which PEREZ replied "I am in Dillon, Colorado."  At approximately 12:33 pm, MEJIA called PEREZ to ask where she was.  PEREZ responded that she was unable to make it to Denver because there was too much snow.

        e.   Based on the above communications, SA Hatch contacted Colorado State Trooper Jake Best to conduct a traffic stop of PEREZ outside of Dillon, Colorado.  Trooper Best subsequently searched PEREZ's Honda Civic and found 11 cylindrical objects wrapped in black electrical tape in the

trunk.  SA Hatch conducted a presumptive test on the 11 cylindrical objects, which tested positive for cocaine.[7]

    f.  Based on my training and experience, my knowledge of the investigation, and the fact that PEREZ stated that she was transporting narcotics on behalf of "Gallo," I believe that PEREZ was transporting narcotics to MEJIA on behalf of GURROLA or one of GURROLA's associates.  Given that GURROLA frequently utilizes Facebook Messenger to make arrangements for couriers,[8] I believe it is likely that a search of SUBJECT ACCOUNT #1 will reveal messages regarding the above seizure.

## V.   Preservation Requests to Facebook

    20.  On December 6, 2018 a preservation request was sent to Facebook requesting that information associated with SUBJECT ACCOUNT #1, SUBJECT ACCOUNT #2, and SUBJECT ACCOUNT #3 be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

    21.  On May 14, 2019 another preservation request was sent to Facebook requesting that information associated with SUBJECT ACCOUNT #2 be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

    22.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS by other means.

---

    [7] We are currently awaiting the final chemical analysis of this substance.

    [8] Toll data does not show any direct communications between GURROLA and PEREZ during this time period.  However, given GURROLA's history of recruiting and arranging new couriers through prior couriers, I believe it is likely that GURROLA made arrangements for this narcotics transaction through a third party.

## VI.  <u>BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER</u>

23.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like Facebook, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

24.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

25.   A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

26.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (_i.e._, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

27.  In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

28.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal

activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

29.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

30.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or code words (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use

pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

31. Providers of e-mail and social media often maintain, have access to, and store information related to the location of the users of accounts they service. That information may be obtained by the provider in a number of ways. For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information. It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

32. Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNTS. Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices.

Individual computers or devices are identified by a number of
different means, some of which are assigned to a particular
device by a manufacturer and connected to the "hardware" or the
physical device, some are assigned by a cellular telephone
carrier to a particular account using cellular data or voice
services, and some are actually assigned by the provider to keep
track of the devices using its services.  Those device
identifiers include Android IDs, Advertising IDs, unique
application numbers, hardware models, operating system versions,
unique device identifiers, Global Unique Identifiers or "GUIDs,"
serial numbers, mobile network information, phone numbers,
device serial numbers, Media Access Control ("MAC") addresses,
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity
Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNTS, had previously used
an identifier that was unique to the hardware of its devices,
such that details of a device's activity obtained from a
particular application or "app" could be used to target
advertisements for the user of that device.  Apple replaced that
hardware-based identifier with the Apple advertiser ID or IDFA
that is still unique to a particular device, but which can be
wiped and re-generated anew by a user if a user chooses to do

23

so.  Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services.  Google uses a similar advertiser ID referred to as an AAID.

33.  These device identifiers can then be used (a) to identify accounts accessed at other providers by that same device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access a SUBJECT ACCOUNT.  The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

34.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

35.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare

against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

36.  Based on a review of information provided by Facebook regarding its services and data retention policies, information provided by other investigators, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Facebook.

37.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

38.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This subscriber information may include the user's full name, any alternate names such as a maiden name or nickname, birth date, gender, contact e-mail addresses (including deleted addresses), Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook stores both current and prior information, such as past addresses or names provided by a user.  Facebook also assigns a user identification number to each account.  Facebook also allows users to "link" other accounts (i.e., accounts maintained at other providers of e-mail or social media services) to their Facebook accounts, and stores information about these linked accounts.

39.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request," records of which requests Facebook retains.  If the recipient of a "Friend Request" accepts the request, then the

two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.  Facebook also retains lists of users that have been removed or deleted as "Friends."  A user can also indicate that some "Friends" are family members, which Facebook stores as "Family" data.  Facebook also retains lists of persons a user "follows" as well as a list of those persons who "follow" the user.  Facebook also retains data regarding any friends, apps, or pages a user has "hidden" from their News Feed.

40.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41.  Facebook users can create profiles in the "About" section of their timeline that include information about relationships, work, education, where the user lives currently, their "hometown," and personal interests, as well as photographs

and other information, including "Favorite Quotes."  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  Facebook also retains data for locations associated with updates to a user's account (called "last location").  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42.  Facebook allows users to upload photos and videos, which may include metadata (such as EXIF data[9]) that can indicate, for example, the user's location when s/he captured or uploaded the photo or video, and the date and time the image was captured or uploaded.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.

---

[9] EXIF stands for "exchangeable image file format," and is a standard used by digital cameras and other systems handling image and sound files captured by such devices.  EXIF data is a term used by Facebook to refer to certain kinds of metadata associated with user image files.

For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

43.   Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  Facebook stores posts to a user's own page, as well as posts by a user to other peoples' pages and posts by others to the user's page.  In addition, Facebook has a feature that allows users to send and receive instant messages or "chats" through Facebook.  These communications are stored in the history of communications for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.  Facebook users can also send files in various other formats as attachments to private messages.  For example, a user can send another Facebook account a compressed archive file in the format .zip as an attachment to a message.

44.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

45.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook retains information on posts, photos, or content a user has "liked," as well as "likes" about a user's own posts, photos, or other content; Facebook also retains data regarding "likes" a user has made on sites off of Facebook.  Facebook users can also become "fans" of particular Facebook pages.

46.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

47.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

48.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

49.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a

personalized message can be attached to each gift.  Facebook
users can also send each other "pokes," which are free and
simply result in a notification to the recipient that he or she
has been "poked" by the sender.  Lists of who has "poked" a user
and who has been "poked" by a user are retained by Facebook,
except for "poke" content from the mobile app, which is
available for only a brief period of time.

50.  Facebook also has a Marketplace feature, which allows
users to post free classified ads.  Users can post items for
sale, housing, jobs, and other items on the Marketplace.

51.  In addition to the applications described above,
Facebook also provides its users with access to thousands of
other applications ("apps") on the Facebook platform.  When a
Facebook user accesses or uses one of these applications, an
update about that the user's access or use of that application
may appear on the user's profile page.  Facebook also retains
lists of all of the apps a user has added.

52.  Some Facebook pages are affiliated with groups of
users, rather than one individual user.  Membership in the group
is monitored and regulated by the administrator or head of the
group, who can invite new members and reject or accept requests
by users to enter.  Facebook can identify all users who are
currently registered to a particular group and can identify the
administrator and/or creator of the group.  Facebook uses the
term "Group Contact Info" to describe the contact information
for the group's creator and/or administrator, as well as a PDF
of the current status of the group profile page.

31

53.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

54.   Facebook also stores information relating to each active session by a user, including date, time, device, Internet Protocol ("IP") address, machine cookie, and browser information.  These session logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the machine ID, user ID, and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address, browser, and device ID the user did so.

55.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including activation date and deactivation, disabling, or deletion dates, if

32

applicable), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

56.  Facebook also allows users to access their account via a Facebook "app" on mobile devices.  If the user is accessing the Facebook app from an Apple device, such as an iPhone or iPad, and has notifications enabled, Apple will assign a "device token" or "push token" to that device for use with the Facebook app specifically (Apple will assign different tokens for each relevant app, such as Twitter or Instagram).  Facebook, in turn, will have a record of that device token or push token in its records for the user's account.  Therefore, obtaining the device token or push token number can allow investigators to connect a particular device to access of a person's Facebook account, which will also allow them to identify the relevant device if electronic devices are recovered later in the investigation.

57.   Facebook retains, for a limited period, information about ads clicked by an account user, including dates, times, and titles of ads clicked.

58.   Facebook retains a list of topics that a given user may be targeted against, based on previously stated "likes," interests, and other data in the user's timeline.

59.   If a user makes purchases on Facebook, for example in an app, and gives Facebook their credit card number for such purchases, Facebook will retain that number.

60.   Facebook generates a unique facial recognition number for each user based on a comparison of photos in which that person is tagged.

61.   Facebook allows users to "share" content, such as news articles, with others on Facebook, and retains information relating to such "shares."

62.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.

This "user attribution" evidence is analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.  For example, profile contact information, private
messaging logs, status updates, and tagged photos (and the data
associated with the foregoing, such as date and time) may be
evidence of who used or controlled the Facebook account at a
relevant time.

63.  Further, Facebook account activity can show how and
when the account was accessed or used.  For example, as
described herein, Facebook logs the IP addresses from which
users access their accounts along with the time and date.  By
determining the physical location associated with the logged IP
addresses, investigators can understand the chronological and
geographic context of the account access and use relating to the
crime under investigation.  Such information allows
investigators to understand the geographic and chronological
context of Facebook access, use, and events relating to the
crime under investigation.  Additionally, as described above,
Facebook builds geo-location into some of its services.  This
geographic and timeline information may tend to either inculpate
or exculpate the Facebook account owner.

64.  Last, Facebook account activity may provide relevant
insight into the Facebook account owner's state of mind as it
relates to the offense under investigation.  For example,

information on the Facebook account may indicate the owner's
motive and intent to commit a crime (e.g., information
indicating a plan to commit a crime), or consciousness of guilt
(e.g., deleting account information in an effort to conceal
evidence from law enforcement).

65.   Therefore, the computers of Facebook are likely to
contain all the material described above, including stored
electronic communications and information concerning subscribers
and their use of Facebook, such as account access information,
transaction information, and other account information.

## VII. REQUEST FOR NON-DISCLOSURE

66.   Pursuant to 18 U.S.C. § 2705(b), I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscribers of the SUBJECT ACCOUNTS, of
the existence of the warrant until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date this warrant is signed by the magistrate
judge or such later date as may be set by the Court upon
application for an extension by the United States.  There is
reason to believe that such notification will result in:
(1) endangering the life or physical safety of an individual;
(2) flight from prosecution; (3) destruction of or tampering
with evidence; (4) intimidation of potential witnesses;
(5) otherwise seriously jeopardizing the investigation; or
(6) unduly delaying trial.  The current investigation set forth

above is not public, and I know, based on my training and
experience, that narcotics traffickers will destroy evidence or
alter their methods in order to frustrate law enforcement
efforts if the trafficker learns of an investigation.  In
addition, if the PROVIDER or other person notifies the targets
of the investigation that a warrant has been issued for a
SUBJECT ACCOUNT, the targets of investigation might further mask
their activity and seriously jeopardize the investigation.

### VIII.    <u>CONCLUSION</u>

67.  Based on the foregoing, I request that the Court issue
the requested warrants.

_____
ALBERT J. SMITH
Special Agent, Drug
Enforcement Administration

Subscribed to and sworn before me
this 14th day of June, 2019.

_____
HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE